UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| Stone Resources, Inc., | : | |
| Debtor. | : | Bankruptcy No. 11-11124-MDC |

# M̲E̲M̲O̲R̲A̲N̲D̲U̲M̲ ̲O̲P̲I̲N̲I̲O̲N̲

On April 28, 2015, this Court held a hearing (the "Hearing") to address the Motion for Orders of Determination of Outstanding Motions dated February 26, 2015 [Docket No. 398] (the "Motion"), filed by Gary F. Seitz, Chapter 7 Trustee for the Estate of Stone Resources, Inc. (the "Chapter 7 Trustee").  The Motion sought adjudication of three motions that were originally addressed by this Court at a hearing held on May 23, 2012 (the "Initial Hearing," collectively with the "Hearing," the "Hearings"), but were not adjudicated due to the entry, by this Court, of an Order dated November 6, 2012 [Docket No. 315] (the "Suspension Order"), that suspended the bankruptcy case of Stone Resources, Inc. (the "Debtor") pending the resolution of the Debtor's then-pending appeal to the Third Circuit.

The three motions are: (1) Motion for an Order Prohibiting Compensation and the Disgorgement of Funds dated February 1, 2012 [Docket No. 141] (the "Disgorgement Motion"), filed by MarbleLife, Inc. ("MarbleLife");[1] (2) a Motion to Pay Compensation to Joseph T. Smith ("Mr. Smith") dated February 15, 2012 [Docket No. 157] (the "Compensation Motion"); and (3) a Motion to Disqualify Debtor's Counsel dated March 2, 2012 [Docket No. 178] (the "Disqualification Motion"), filed by the United States Trustee (the "US Trustee").  As agreed by the parties at both of the Hearings, this Court must address the Disqualification Motion prior to addressing the other motions.

For the reason elaborated below, this Court will deny the Disqualification Motion.  While the

---

[1] MarbleLife did not appear at the Hearing on behalf of its Disgorgement Motion.  In fact, counsel for MarbleLife withdrew its appearance on September 19, 2014.

representation of the Debtor by Paul J. Winterhalter ("Mr. Winterhalter") raises concern for the Court,[2]

this Court does not believe, and the US Trustee did not argue, that Mr. Winterhalter should be

disqualified based upon any alleged failure to abide by his obligations to this Court and to his client.  *See,*

*e.g., In re Gress,* Bky. No. 13-06202, 2015 WL 1744165, *3-4 (Bankr. M.D. Pa. Apr. 14, 2015)

(addressing whether allegations of malpractice are sufficient to establish cause for disqualification).

While the behavior of Mr. Winterhalter may be reason for this Court to revisit other matters,[3] this Court

does not find that his dual representation implicates a disqualifying conflict.

## I.    PROCEDURAL HISTORY

This dispute is one of many skirmishes resulting from the execution of a Franchise Agreement

dated April 3, 2000 (the "Franchise Agreement"), by and between MarbleLife, as franchisor, and the

Debtor, as franchisee.  Pursuant to the Franchise Agreement, the Debtor obtained the right to operate as a

"MarbleLife" franchisee within a specific geographic area that included certain areas of Pennsylvania,

New Jersey and Delaware.  In return, the Debtor agreed to be abide by certain obligations, including a

noncompetition agreement and confidentiality agreement (the "Restrictive Covenants"), that became

---

[2] District Judge Tucker, in her Memorandum Opinion dated May 16, 2012, made several findings regarding Mr. Winterhalter's conduct before this Court.  She determined, as a matter of fact, that several of the representations made by Mr. Winterhalter to this Court on behalf of his client were "patently false."  *MarbleLife, Inc. v. Stone Resources, Inc.*, Civ. No. 10-2480, 2012 WL 1719439, *4 (E.D. Pa. May 16, 2012).  In addition, District Judge Tucker determined that Mr. Winterhalter's "assurances… to the Bankruptcy Court… were meritless misrepresentations."  *MarbleLife, Inc. v. Stone Resources, Inc.*, Civ. No. 10-2480, 2012 WL 1719439, *4 (E.D. Pa. May 16, 2012).  In light of these findings, this Court entered an Order dated April 8, 2016, scheduling a status conference to permit the parties to address whether Mr. Winterhalter's conduct as described by District Court Judge Tucker constituted an additional basis to deny Mr. Winterhalter's compensation.  *See, e.g., In re Gunn*, 171 B.R. 517, 519 (Bankr. E.D. Pa. 1994) ("bankruptcy courts also have the same powers to regulate the conduct of non-attorneys who attempt to assist debtors who come before it as they do attorneys").  After hearing from the parties, this Court does not believe that District Judge Tucker's findings implicate the resolution of the Motion.  However, this Court does believe that District Judge Tucker's findings do implicate this Court's duty to police the conduct of its officers.

Contrary to Mr. Winterhalter's apparent understanding, his obligations to his clients do not trump his obligations, including most significantly his duty of candor, to this Court.  *See, e.g., Nix v. Whiteside*, 475 U.S. 157, 168 (1986) ("an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct...."); *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1067 (7th Cir. 2000) ("the duty to protect client confidentiality does not come before the duty to be honest with the court."); *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 458 (4th Cir. 1993) ("we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit."); *Eagan by Keith v. Jackson*, 855 F. Supp. 765, 790 (E.D. Pa. 1994) ("Even beyond the requirements of Rule 3.3(d), an attorney, as an officer of the Court, has an overarching duty of candor to the Court.").

[3] To date, this Court has not entered a final order approving Mr. Winterhalter's compensation.  *See, e.g., Specker Motor Sales Co. v. Eisen*, 393 F.3d 659, 662-63 (6th Cir. 2004) ("Interim compensation is subject to re-examination and adjustment."); *In re Firstmark Corp.*, 46 F.3d 653, 659 (7th Cir. 1995) ("interim awards of compensation under 11 U.S.C. §331, like interim compensation awards in civil cases, are not final orders because a court can reexamine them throughout the case, until the court makes a final compensation decision.").

effective upon the expiration or termination of the Franchise Agreement.  Mr. Smith, as the Debtor's

principal and sole shareholder, separately agreed to be bound by the restrictive covenants contained

within the Franchise Agreement.

By its terms, the Franchise Agreement was scheduled to terminate upon April 3, 2010.  For

whatever reason, the Debtor did not seek to renew the Franchise Agreement.  Upon termination,

MarbleLife immediately informed the Debtor and Mr. Smith of its intent to enforce the Restrictive

Covenants and to install a new franchisee within the Debtor's former geographic area.  Rather than cease

operations as required by the terms of the Franchise Agreement, the Debtor through Mr. Smith continued

to operate.  *See, e.g., In re Stone Resources, Inc.*, 458 B.R. 823, 827 (E.D. Pa. 2011) (finding that the

Debtor continued to operate its MarbleLife franchise after the termination of the Franchise Agreement).

**The 10-2480 District Court Proceeding**

To enforce the non-compete provisions of the Franchise Agreement, MarbleLife filed a complaint

dated May 21, 2010, in the Eastern District of Pennsylvania, Civ. No. 10-2480, seeking injunctive relief

against the Debtor (the "2480 Litigation"), naming the Debtor as the sole defendant.  Simultaneously,

MarbleLife filed a Motion for a Preliminary Injunction dated May 21, 2010 [Docket No. 6, Civ. No. 10-

2480].  In response, the Debtor argued that the Franchise Agreement in general and Restrictive Covenants

in particular were not enforceable because MarbleLife had fraudulently induced the Debtor to agree to the

terms of the Franchise Agreement.  Specifically, the Debtor argued that MarbleLife had misrepresented

the nature of its ownership of certain patents governing MarbleLife's business practices and that these

alleged misrepresentations served as a defense to the enforcement of the Restrictive Covenants.

After holding a three-day hearing that commenced on December 7, 2010, to address MarbleLife's

request for a preliminary injunction, the District Court entered a preliminary injunction on December 23,

2010 (the "First Injunction Order").  Pursuant to the First Injunction Order, the District Court ordered the

Debtor to immediately undertake certain acts, including but not limited to, the cessation of the Debtor's

use of the MarbleLife trademark, the delivery of a list of the Debtor's existing customers since May 2000

including all invoices for such customers, and the transfer of certain business phone numbers to

MarbleLife.  In addition, the Debtor was ordered to cease and desist from engaging, participating or

assisting in any business that provides certain stone restoration and refinishing services.  The Debtor

subsequently filed a motion for reconsideration as well as requested the District Court to set a bond for

the preliminary injunction.  In response, the District Court entered a second order on February 11, 2011,

docketed on February 14, 2011 (the "Second Injunction Order") (collectively with the first, the

"Injunction Orders"), denying the Debtor's motion for reconsideration.  Shortly after the Second

Injunction Order, the Debtor filed its Chapter 11 petition on February 16, 2011 (the "Petition Date").  As

a result of the Debtor's filing for Chapter 11 relief, the 2480 Litigation was placed in civil suspense

pursuant to an Order dated February 28, 2011.

**The Debtor's Bankruptcy**

On February 16, 2011, the Debtor filed a voluntary petition for Chapter 11 relief.  Seven days

later, MarbleLife filed a motion requesting that this Court, on an expedited basis, issue an order

dismissing the Debtor's bankruptcy petition or, in the alternative, granting MarbleLife relief from the

automatic stay to enforce the Injunction Orders.  As elaborated by this Court's Memorandum Opinion

dated March 28, 2011,[4] this Court denied MarbleLife's motion.

**The Initiation of District Court Contempt Proceedings**

Despite the placement of the 2480 Litigation in civil suspense, MarbleLife filed in that action a

Motion for Contempt dated April 1, 2011 [Docket No. 61, Civ. No. 10-2480] (the "First Contempt

Motion"), requesting the District Court find Mr. Smith, and not the Debtor, in civil contempt of the

District Court's Second Injunction Order.  MarbleLife did not seek to enforce the Injunction Orders

against the Debtor.  Mr. Winterhalter filed a Response dated April 15, 2011 [Docket No. 62, Civ. No. 10-

2480], on behalf of Mr. Smith, "individually and as the sole corporate fiduciary on behalf of Stone

Resources, Inc."  As argued by the US Trustee, Mr. Winterhalter's representation of Mr. Smith

commenced as of the filing of this pleading.  In addition, the US Trustee argues that this filing triggered

the existence of the alleged conflict that warrants Mr. Winterhalter's disqualification.

---

[4] *In re Stone Resources, Inc.*, 448 B.R. 361 (Bankr. E.D. Pa. 2011).

After considering the parties' arguments, the District Court entered an Order dated April 25, 2011

[Docket No. 63, Civ. No. 10-2480] (the "First Contempt Order"). In its First Contempt Order, the District

Court observed:

> [T]his case presents a situation where Smith, although not a party to this action, is the real party defendant. Here, Smith is the sole shareholder, director and officer of Stone Resources. The Court appreciates that Smith is independently bound by the non-compete provision, however, for all intents and purposes the issuance of a civil contempt order against Smith would be the functional equivalent as issuing the order against Defendant, as Stone Resources would be forced to indemnify Smith… **Any judgment against Smith would in effect be a judgment against Defendant and would be in direct conflict with the mandates of §362.**

First Contempt Order, n.1 (emphasis added).

**The 11-2526 District Court Proceeding**

In response to this Court's Order denying MarbleLife relief to enforce the Injunction Order, and

while MarbleLife's First Contempt Motion remained pending in the 2480 Litigation, MarbleLife filed a

Certificate of Appeal dated April 12, 2011, in the Eastern District of Pennsylvania, Civ. No. 11-2526,

seeking review by the District Court of this Court's decision to deny relief from the automatic stay (the

"2526 Litigation"). After hearing oral arguments on June 11, 2011, the District Court entered an Order

dated June 24, 2011, upholding this Court's denial of MarbleLife's request to dismiss the Debtor's

bankruptcy case and reversing this Court's determination that the Injunction Orders were subject to the

automatic stay.[5] In addition, the District Court modified its Order dated February 11, 2011, entered in the

2480 Litigation to, *inter alia*, extend the term of the injunction preventing the Debtor from operating.

In addition to its review of this Court's Order denying MarbleLife relief from the automatic stay,

the District Court took the opportunity to make a series of factual findings relating to the Debtor's

compliance with the Injunction Orders. Among the District Court's findings, the District Court

determined that the Debtor had "failed to comply with several portions of the Court's [Injunction Orders]

in flagrant disregard of the Court's directives." *In re Stone Resources, Inc.*, 458 B.R. 823, 829 (E.D. Pa.

2011) (the "District Court Opinion").

---

[5] *In re Stone Resources, Inc.*, 458 B.R. 823, 827 (E.D. Pa. 2011).

Before this Court had an opportunity to act upon the District Court's determination, the Debtor

filed a notice of appeal dated July 11, 2011, with the Third Circuit Court of Appeals seeking review of the

District Court's June 24th Order.  After hearing the parties' arguments, the Third Circuit issued an

Opinion dated May 29, 2012,[6] vacating the District Court Opinion and vacating the District Court's Order

that had modified the Injunction Orders.  After the entry of the Third Circuit's Opinion on the District

Court's docket, no other actions were taken other than the entry of a Stipulation of Dismissal dated March

13, 2014.

**The Leasing Motion**

On October 20, 2011, the Debtor filed a Motion for Authorization to Lease Property of the Estate

[Docket No. 93] (the "Leasing Motion").  Pursuant to the Leasing Motion, the Debtor sought permission

from this Court to enter into a certain Equipment Lease Agreement dated October 1, 2011, by and

between the Debtor and Moore Jones Building Services Solutions LLC (the "Lease Agreement") wherein

the Debtor would, effective as of September 1, 2011, lease certain business equipment and real estate (the

"Leased Property") to Moore Jones Building Services Solutions LLC ("Moore Jones").  Curiously, the

Lease Agreement provided for an effective date of September 1, 2011, with the first payment being due as

of October 15, 2011, five days prior to the Debtor's filing of the Leasing Motion.[7]  As acknowledged by

the Debtor, the Leased Property consists of the equipment, vehicles and materials used by the Debtor in

connection with its stone restoration business.  In addition, the Leased Property included the Debtor's

interest in certain real estate located at 60 Old State Road, Media, Pennsylvania.[8]

In exchange for its use of the Leased Property, Moore Jones agreed to pay the Debtor a sum of

$20,500 per month or $246,000 annually.  In addition, Moore Jones agreed to assume all of the Debtor's

---

[6] *In re Stone Resources, Inc.*, 482 Fed. Appx. 719 (3rd Cir. 2012).

[7] Despite the appearance that the Leasing Motion sought permission from this Court to engage in conduct that has already occurred, the Debtor did not characterize the Leasing Motion as seeking *nunc pro tunc* relief.  For whatever reason, the Debtor did not challenge the fact that the Lease had already commenced.  For example, Mr. Winterhalter characterized the evidence as establishing: "to date, one payment has been received, it was received in November…  The agreement is effective September 1, it's for 12 months, and it provides for 12 monthly payments of $20,500."  Transcript 12/13/2011, 119:9-16.

[8] In the Debtor's Schedule G filed with this Court on March 2, 2011 [Docket No. 28], the Debtor disclosed its interest in a real estate lease for 60 Old State Road, Media, Pennsylvania.  By operation of §365(d)(4), this lease was "deemed rejected" as of June 16, 2011.

commercial real estate obligations.[9]  As acknowledged by the Debtor, Moore Jones entered into the Lease

Agreement for the purpose of augmenting its existing stone restoration business.

As stated in the Lease Agreement:

the Lessee operates as a similar and competing business servicing larger scale customers
in the western suburbs of the Philadelphia Metropolitan market and is desirous of
entering into this agreement to make use of and lease the commercial business
equipment, trucks and materials of the Lessor for a definitive period;

Lease Agreement, p.2.

In response to the Leasing Motion, MarbleLife filed an Objection dated November 10, 2011

[Docket No. 100] (the "Leasing Objection").  In the Leasing Objection, MarbleLife argued that Debtor

was not seeking prospective relief.  Rather, MarbleLife stated that the Debtor, to circumvent the

Injunction Orders, had previously entered into the business arrangement with Moore Jones.  Specifically,

MarbleLife argued that the Leasing Motion should be denied because it was an improper attempt to obtain

*nunc pro tunc* relief.  Pointing to the Lease's September 1, 2011, effective date, MarbleLife argued that

the Leasing Motion was procedurally deficient because it was not filed prior to the occurrence of the

proposed action.  *See, e.g.,* Fed. R. Bankr. P. 2002(a)(2) (requiring §363(b) motions must provide at least

21-days' notice of "a *proposed*… lease of property") (emphasis added); Fed. R. Bankr. P. 6004(b)

(providing that objections to §363(b) motions must be filed at least "seven days before the date set for the

proposed action…").  In addition, MarbleLife alleged that Moore Jones had been operating the Debtor's

vehicles and paying for their costs since at least August 2011.  Leasing Objection, ¶19.

On December 13, 2011, this Court held a hearing on the Leasing Motion.  In addition, this Court

addressed the Debtor's motion to extend the exclusivity period.  At the hearing, this Court heard the

testimony of Cecil Moore, Moore Jones's managing partner.  As characterized by Mr. Moore, the Lease

Agreement "was effective… the first term was October."  Transcript of December 13, 2011 Hearing

("Transcript December 13, 2011"), 12:13-14.  He further acknowledged that Moore Jones had already

begun making payments under the Leasing Agreement and that the Debtor, without Court approval, had

---

[9] At the hearing, the Debtor challenged the language of the Lease Agreement stating that, in reality, the Debtor was continuing to
pay rent for the real estate.  Transcript December 11, 2011, 66:16-25.

received the first payment in the amount of $20,500 on November 15, 2011, for the October term.

Transcript December 13, 2011, 14:7-17.  Mr. Moore further acknowledged that Moore Jones began using

the Debtor's property and equipment in August of 2011.  Transcript December 13, 2011, 30:17-20.

When asked why the Debtor had entered into the Lease Agreement without court approval, Mr.

Smith stated:

> I was trying to negotiate a lease agreement for the best use of the equipment, the assets of
> Stone Resources in the Bankruptcy, in keeping with the faith of the Federal order.  In
> trying to negotiate that, I had to convince Moore Jones that there was value to what I
> would like them to enter into.

Transcript December 11, 2011, 65:3-7.

Mr. Smith further admitted that during the months of August and September, Moore Jones paid

the expenses associated with the use of the equipment.  Transcript December 13, 2011, 65:19-24.

At the December 13 hearing, this Court expressed its concern that the Lease Agreement was an

attempt to circumvent the injunction.  Transcript December 13, 2011, 130:20-25 ("it just doesn't sort of

look right").  Specifically, this Court observed that Moore Jones was affiliated with a company by the

name of Budget Maintenance, a company owned and operated by the husband of Maria Jones and a pre-

existing competitor of Stone Resources.

This Court flatly asked Mr. Winterhalter: "Is the Debtor trying to get around the order?"

Transcript December 13, 2011, 134:15-17; *see also* Transcript December 13, 2011, 135:14-15 ("I'm

concerned that this is nothing but a way to get around the injunction.").  As this Court elaborated:

> I was concerned about whether… this is some sort of end-run around that injunction. I
> don't have any evidence that there is any, and you haven't given me any other than
> suspicions, and I can't make it on suspicions.  And I don't know how you -- I don't know
> how I can come to some conclusion, absent some evidence.

Transcript, December 13, 2011, 149:10-11.

In response, Mr. Winterhalter explained:

> It was able to enter into truly an arm's length lease agreement, an arm's length lease
> agreement with this company Moore Jones, to pay them $20,500 a month for the
> purposes of using its equipment for a limited period of time.

Transcript December 13, 2011, 137:8-12.

8

Despite the appearance that the Debtor had already entered into the Leasing Agreement and had begun performance of its obligations under it, this Court overruled the Leasing Objection and entered an Order dated January 10, 2012 [Docket No. 124], granting the Leasing Motion and authorizing the Debtor to enter into the Lease Agreement.  Addressing the issue of good faith, this Court stated:

> As I said, I was very concerned with good faith, whether this was some end-run by the Debtor to try to get the lease -- get a lease and sort of stay in business through some, I don't know, I guess like a -- through another company. I haven't had any evidence of that. There's nothing to the contrary.

Transcript, December 13, 2011, 152:10-150:15; *see also* Transcript, December 13, 2011, 142:25-143:4 ("I have no evidence to the contrary that Mr. Smith or Mr. Moore, that their evidence wasn't -- I have no reason to doubt their testimony. There wasn't anything presented on the record that said they weren't telling the truth.").

**The 10-2480 Contempt Motions**

After the District Court concluded that the automatic stay did not prevent the enforcement of the Injunction Orders and proceeding concurrently with this Court's consideration of the Leasing Motion, MarbleLife filed a Third Motion for Contempt dated August 11, 2011 [Docket No. 67, Civ. No. 10-2480] (the "Third Contempt Motion").  Pursuant to the Third Contempt Motion, MarbleLife requested the entry of an order holding the Debtor and Mr. Smith in civil contempt.  Significantly, MarbleLife addressed the Third Contempt Motion to the Debtor and Mr. Smith in his individual capacity.  Mr. Winterhalter filed a Response dated August 25, 2011 [Docket No. 68, Civ. No. 10-2480], on behalf of the Debtor and Mr. Smith, "individually and as the sole corporate fiduciary on behalf of the Debtor…"  On February 16, 2012, the District Court issued an order scheduling a hearing on the Third Contempt Motion for March 15, 2012.

After a four-day hearing on the Third Contempt Motion, the District Court issued its Memorandum Opinion dated May 16, 2012 [Docket No. 85, Civ. No. 10-2480] (the "Contempt Memorandum")[10], resolving MarbleLife's Contempt Motion.  *MarbleLife, Inc. v. Stone Resources, Inc.*,

---

[10] *MarbleLife, Inc. v. Stone Resources, Inc.*, Civ. No. 10-2480, 2012 WL 1719439 (E.D. Pa. May 16, 2012).

Civ. No. 10-2480, 2012 WL 1719439 (E.D. Pa. May, 16, 2012).  In support of its finding holding Mr.

Smith and the Debtor in civil contempt of the Injunction Orders, the District Court included several

findings relating to the conduct of Mr. Winterhalter.  The District Court specifically determined that Mr.

Winterhalter was a direct participant in the contumacious behavior.  For example, the District Court

describes the circumstances of the formation of the scheme.

> Setting the background for this testimony is an email between Smith and a representative
> from BOMA on August 18, 2011, in which Smith writes, "[w]e have been working on
> our plan B for my company to comply with the position we are in with the federal court
> while awaiting our appeal to the third circuit federal court.  All accounts will be serviced
> by another entity until resolution of the legal dispute."  (Pl.'s Ex. 68).  The discussions
> regarding the formation of this "other entity" began on August 10, 2011, when Cooney,
> Smith, John Jones ("Jones") of Moore Jones, and attorney for Smith and Stone
> Resources, Paul Winterhalter ("Winterhalter"), met at Winterhalter's office to discuss the
> possibility of Moore Jones starting a stone and tile division which would utilize Stone
> Resource's employees and equipment and for which Cooney would solicit past clients of
> Natural Stone Care.

*MarbleLife, Inc. v. Stone Resources, Inc.*, Civ. No. 10-2480, 2012 WL 1719439, *6 (E.D. Pa.
May 16, 2012).

In addition, the District Court determined that Mr. Winterhalter knew that the Debtor and Moore

Jones had begun their scheme prior to the drafting of the Lease Agreement.

> According to Moore, despite the October 2011 execution of the lease agreement, given
> the grace period, the parties to the agreement acted under the assumption that there was a
> partnership agreement between Stone Resources and Moore Jones throughout the months
> of August and September. (4/10/12 Tr. 3–9); see also, Pl's Ex. 83 (describing a
> conversation between, Eugene Orlando ("Orlando"), counsel for Moore Jones, and
> Winterhalter, in which *Winterhalter informed Orlando that "he thought [Moore Jones
> and Stone Resources] were already operating under a verbal lease arrangement perhaps
> even several weeks before [Orlando] was first contacted to review the first draft of this
> agreement*."

*MarbleLife, Inc. v. Stone Resources, Inc.*, Civ. No. 10-2480, 2012 WL 1719439, *7 (E.D. Pa.
May 16, 2012) (emphasis added).

Of particular concern to this Court are the District Court's findings regarding the truthfulness of

Mr. Winterhalter's statements made in connection with his representation of the Debtor before this

Bankruptcy Court.  With regard to Mr. Winterhalter's performance of his duties to the Debtor, the District

Court specifically found that he "failed to ensure the Court that [the Debtor] acted in good faith."

*MarbleLife, Inc. v. Stone Resources, Inc.*, Civ. No. 10-2480, 2012 WL 1719439, *9 (E.D. Pa. May 16,

2012).[11]  Aggravating matters, the District Court found that Mr. Winterhalter's representations to this

Court with regard to my consideration of the Leasing Motion "patently false" and constituted "meritless

misrepresentations."  *MarbleLife, Inc. v. Stone Resources, Inc*., Civ. No. 10-2480, 2012 WL 1719439, *4-

6 (E.D. Pa. May, 16, 2012).[12]  Despite these findings, the District Court permitted Mr. Winterhalter to

continue with his representation of the Debtor in the 2480 Litigation.

### The 11-7679 District Court Proceeding

While the Debtor's appeal of the District Court Opinion to the Third Circuit and MarbleLife's

Third Contempt Motion remained pending, MarbleLife filed a complaint dated December 15, 2011, in the

Eastern District of Pennsylvania, Civ. No. 11-7679, against Concrete Resources, Inc., Patricia Cooney,

Joshua Graham, Cecil More, Moore Jones Building Services Solutions LLC, and Mr. Smith (the "7679

Proceeding").  The Debtor was not named as a defendant in the 7679 Proceeding.  As stated in the

complaint, MarbleLife alleged that the defendants had, as evidenced by the Leasing Agreement, conspired

to evade the District Court's Injunction Orders as well as the obligations of the Debtor, Mr. Smith and

Mr. Graham under the terms of the Franchise Agreement.  In response, Mr. Winterhalter appeared on

behalf of Mr. Smith, Concrete Resources, and Joshua Graham.  To that end, Mr. Winterhalter filed an

Answer dated January 17, 2012 [Docket No. 10, Civ. No. 11-7679], on behalf of Concrete Resources and

Mr. Smith.  In addition, Mr. Winterhalter filed an Answer dated January 23, 2012 [Docket No. 10, Civ.

No. 11-7679], on behalf of Joshua Graham.  Despite the District Court's prior findings in the Contempt

Memorandum, District Court permitted Mr. Winterhalter to represent Mr. Smith in the 7679 Litigation.

---

[11] In full, Judge Tucker wrote:

> Defendant's counsel also *failed to ensure the Court that Defendant acted in good faith*.  For example, in an
> August 2011 email responding to Cooney regarding a question about the proper source of the start-up funds
> for the Moore Jones venture, Winterhalter responded: "Joe did mention the startup cost challenge.  That
> money cannot come from SR. Could come from Joe to you to MJ. We can work that out." (Pl.'s Ex. 64).  The
> Court also takes issue with Defense counsel's assurances not only to this Court, but to the Bankruptcy Court,
> that the lease agreement was not an attempt at an "end-run" around the Court's Injunction Order.  (See Pl.'s
> Ex. 93 at 152).  *In light of the evidence, such assurances were meritless misrepresentations*. Correspondingly,
> the Court is not convinced that Defendant or Smith made reasonable efforts to comply with the Court's
> Order.

*MarbleLife, Inc. v. Stone Resources, Inc*., Civ. No. 10-2480, 2012 WL 1719439, *9 (E.D. Pa. May 16, 2012) (emphasis added).

[12] For example, the Debtor through Mr. Winterhalter represented to this Court that "Stone Resources, Inc. did immediately
suspend its business operations."  Motion to Suspend, ¶15.

**The Disqualification Motion**

Contemporaneous with the entry of his appearance on behalf of Concrete Resources, Mr. Smith and Mr. Graham, Mr. Winterhalter also filed in this bankruptcy case a Supplemental Rule 2014(a) Statement dated January 18, 2012 [Docket No. 128] (the "Amended Rule 2014(a) Statement"). In the Amended Rule 2014(a) Statement, Mr. Winterhalter updated his prior disclosures to state that he had filed an answer on behalf of Concrete Resources and Mr. Smith and anticipated that he would be shortly filing an answer on behalf of Mr. Graham. Apparently in response to the filing of the Amended Rule 2014(a) Statement, the US Trustee filed in this bankruptcy case a Notice of Appearance dated January 26, 2012 [Docket No. 135]. Shortly thereafter, the US Trustee filed the instant Disqualification Motion. Mr. Winterhalter filed on behalf of the Debtor a Response to the Disqualification Motion dated March 27, 2012 [Docket No. 197]. No other parties filed any response to the Disqualification Motion.

On May 23, 2012, this Court held the Initial Hearing to address the Disqualification Motion, the Disgorgement Motion and the Compensation Motion. At the beginning of the hearing, the US Trustee informed this Court that it intended to call Mr. Winterhalter as a witness in support of the US Trustee's prosecution of the Disqualification Motion. Transcript of May 23, 2012 Hearing ("Transcript May 23, 2012"), 15:5-25. For whatever reason, the US Trustee had not informed Mr. Winterhalter of the US Trustee's intent to call Mr. Winterhalter as a witness. As a result, Mr. Winterhalter was put in the untenable position of being both a witness and counsel in a matter.

To alleviate the issue, the US Trustee suggested that this Court first address certain documents that the US Trustee believed would "give the Court a basis to summarily disqualify Mr. Winterhalter." Transcript May 23, 2012, 16:17-22. The documents included: (1) the Response in Opposition to the Motion of Plaintiff MarbleLife, Inc. for an Order Holding Joseph T. Smith in Civil Contempt dated April 15, 2011 [Civ. No. 10-2480, Docket No. 62] (the "Smith Response"); (2) the Supplemental Verified Statement of Counsel Pursuant to Bankruptcy Rule 2014(a) dated January 18, 2012 [Docket No. 128] (the "Supplementary 2014(a) Statement"); (3) the Memorandum dated May 16, 2012 [Civ. No. 10-2480, Docket No. 85]; (4) the Transcript of December 13, 2011 Hearing ("Transcript December 13, 2011

Hearing"); and (5) the Notice of Application for Conditional Approval of a Small Business Debtor

Disclosure Statement dated February 6, 2012 [Docket No. 146].  Based upon the statements in these

documents, the US Trustee argued that there was a sufficient basis to disqualify Mr. Winterhalter.

Transcript May 23, 2012, 20:8-20:19.

After the US Trustee filed the Disqualification Motion and prior to this Court holding the Initial

Hearing, the District Court issued its Contempt Memorandum.  At the Initial Hearing, this Court was also

scheduled to address the Disgorgement Motion and the Compensation Motion.  With the consent of the

parties, this Court determined that it must first resolve the Disqualification Motion before it allowed Mr.

Winterhalter to appear on behalf of the Debtor in connection with the adjudication of the Disgorgement

Motion and the Compensation Motion.

In support of its Disqualification Motion, the US Trustee appeared at the Initial Hearing and

relied exclusively upon the District Court's findings as the factual predicate of its Disqualification

Motion.  The US Trustee introduced no other evidence.  Based upon the findings contained in the

Contempt Memorandum, the US Trustee argued Mr. Winterhalter's concurrent representation of the

Debtor and Mr. Smith gave rise to an actual conflict no later than April 15, 2011, the date Mr.

Winterhalter filed papers on behalf of Mr. Smith in the 2480 Litigation in response to the First Contempt

Motion.  In the alternative, the US Trustee argued that even if this Court did not find that Mr. Smith and

the Debtor were sufficiently adverse, then this Court must find that, based upon the findings contained in

the Contempt Memorandum, the Debtor and Mr. Smith necessarily became adverse as of the moment the

District Court published its Contempt Memorandum.  Transcript May 23, 2012, 28:16-20.

To explain why Mr. Winterhalter's concurrent representation of the Debtor and Mr. Smith

implicated an actual conflict of interest, the US Trustee argued that the nature of the contempt

proceedings necessarily made Mr. Smith adverse to the Debtor.  To the extent that the Debtor was

ultimately found to be liable for violating the injunction, the US Trustee argued that the Debtor would

have a claim against Mr. Smith for violating his fiduciary duties.  Transcript May 23, 2012, 24:4-13

("Given that it was Smith that led the debtor down this path, there was immediately borne a conflict when

the issue arose whether Smith was violating the fiduciary duties and Winterhalter could not represent

both."). The US Trustee posited that, in accordance with his obligations to the Debtor, Mr. Winterhalter

should have cast the blame on Mr. Smith in order to avoid the Debtor from incurring any liability for the

conduct of Mr. Smith. Transcript May 23, 2012, 26:13-18. As the US Trustee argued at the Initial

Hearing:

> Instead of defending both the debtor and Smith contending that no violation existed with
> respect to the violation of district court's injunctive order… he should have said the
> debtor has not violated and to the extent there's a violation, Mr. Smith acted ultra vires
> and if there's any sanctions, if there's any violation, if there's any costs, if there are any
> damages, they should be imposed against Mr. Smith individually and pointed at Mr.
> Smith in a third-party claim. Because Mr. Smith is the sole shareholder of that debtor
> and if the debtor was doing something -- if, if there was a violation of that order, it was
> because Mr. Smith did it and he did it outside of what a corporation is allowed to do. But
> he didn't do that. Instead, he defended saying there was no violation.

Transcript May 23, 2012, 22:13-23.

In response to the US Trustee's arguments, Mr. Winterhalter did not deny that he had represented

and continued to represent the Debtor and Mr. Smith in connection with the District Court proceedings.

Transcript May 23, 2012, 40:20-23. However, Mr. Winterhalter argued that his representation of Mr.

Smith and the Debtor did not give rise to an actual conflict and brushed aside the US Trustee's allegations

as nothing more than "horrible imaginations." Transcript May 23, 2012, 34:12-15. Mr. Winterhalter

maintained that the interests of Mr. Smith and the Debtor remained parallel. Despite the District Court's

finding that the Debtor is liable for contempt as a result of Mr. Smith's actions, Mr. Winterhalter argued

that any conflict between the Debtor and Mr. Smith remained, at worst, a potential conflict because there

had been no determination that either party had a claim against the other.

Mr. Winterhalter contended:

> The bottom line, Judge, is, based on the documents you received so far, you will be able
> to determine that… Stone Resources has no claim against Joseph Smith. Joseph Smith
> has no claim against Stone Resources.

Transcript May 23, 2012, 51:2-6.

To reach the conclusion that neither party held a claim against the other, Mr. Winterhalter relied

upon language appearing in the Sanctions Order that acknowledges that the Debtor and Mr. Smith will

not be obligated to make any payments to MarbleLife until the conclusion of the Debtor's bankruptcy.

Transcript May 23, 2012, 51:2-54:5; Sanctions Order, n.1.  Relying on the language of the Sanctions

Order staying the obligations of Mr. Smith and the Debtor to make payment to MarbleLife until the

conclusion of this Bankruptcy case, Mr. Winterhalter argued that the Debtor does not yet have a claim

against Mr. Smith.  He argued that by virtue of this language, his dual representation of Mr. Smith and the

Debtor did not implicate an actual conflict because "there is no monetary damage accessible amongst the

two of them under… any circumstance anywhere."  Transcript May 23, 2012, 56:11-56:17.

After hearing the testimony of Mr. Smith and hearing the arguments of the US Trustee and the

Debtor, this Court informed the parties that it would rule on the Disqualification Motion prior to the start

of the continued hearing on the Disgorgement Motion and the Compensation Motion that was then

scheduled for June 7, 2012.  Transcript May 23, 2012, 180:25-181:1.  The US Trustee and the Debtor

then moved into evidence the documents they wished this Court to consider in connection with the

adjudication of the Disqualification Motion and both parties rested.  The US Trustee and Mr. Winterhalter

both agreed that at the conclusion of the May 23, 2012 hearing, this Court closed the evidentiary record

on the Disqualification Motion.  Transcript April 28, 2015, p. 4, 13.

At the request of the parties, the continued hearing on the Disgorgement Motion and the

Compensation Motion was continued until it was ultimately scheduled for October 22, 2012.  However,

prior to this continued hearing, the Debtor filed a Motion to Suspend the Bankruptcy Proceeding dated

September 28, 2012 [Docket No. 298].  Pursuant to this motion, the Debtor requested this Court suspend

the Debtor's bankruptcy until the resolution of various matters that remained pending before the District

Court.  The resolution of the Debtor's objection to MarbleLife's proof of claim, a proceeding that had

been removed to the District Court due to its relevance to the enforcement of the Injunction Orders, was

the Debtor's paramount concern.  After receiving MarbleLife's Objection dated October 12, 2012

[Docket No. 305], this Court held a hearing on October 22, 2012, on the Debtor's request to suspend its

bankruptcy.  After addressing the parties' arguments, this Court determined that the interests of the

creditors warranted a suspension of this bankruptcy pending a resolution of the District Court

proceedings, informed the parties that it would suspend the bankruptcy case and entered an Order dated

November 6, 2012 [Docket No. 315], to that effect.

**The Continued Bankruptcy Proceedings**

After the resolution of the District Court proceedings pursuant to a Consent Decree and Stipulated

Order dated February 4, 2014, that was entered and approved by the District Court on February 5, 2014

[Docket No. 118, Civ. No. 10-2480], the Debtor filed a Motion to Reopen dated March 10, 2014 [Docket

No. 352] (the "Motion to Reopen").  In addition, the Motion to Reopen contained a request for this Court

to convert the Debtor's bankruptcy to a Chapter 7 case.  After receiving no response to the Motion to

Reopen, this Court entered an Order dated April 9, 2014 [Docket No. 365], reopening the Debtor's

bankruptcy and granting the Debtor's request to convert its case to a proceeding under chapter 7.  Despite

the reopening of the Debtor's bankruptcy case, the parties waited until February 26, 2015, to reschedule

this Court's suspended consideration of the unresolved, Disqualification Motion, Disgorgement Motion

and Compensation Motion.  Pursuant to the Motion, the Chapter 7 Trustee scheduled a hearing on the

three motions for March 24, 2015.  This hearing was ultimately rescheduled to April 28, 2015, when the

US Trustee, the Debtor and Chapter 7 Trustee appeared.

At the commencement of the Hearing, the Chapter 7 Trustee announced that he would not

prosecute MarbleLife's Disgorgement Motion.[13]  Accordingly, the parties once again turned their

---

[13] Pursuant to Local Bankruptcy Rule 4002-1(b), the Debtor's authority to pay compensation to Mr. Smith terminated on April 4, 2011, the 45th day after the Debtor's filing of a petition for bankruptcy relief.  As alleged by the Disgorgement Motion and confirmed by reference to the Debtor's monthly operating reports, the Debtor continued to make weekly payments in the amount of $1,854.00 to Mr. Smith.  As of November 2011, the Debtor increased the weekly payments to Mr. Smith to the amount of $1,959.00.  MarbleLife, pursuant to the Disgorgement Motion, argued that Mr. Smith, as an officer of the Debtor, was not entitled to be paid compensation unless, as required by Local Bankruptcy Rule 4002-1(b), the Debtor first sought and obtained from this Court permission to make such payments.  The unauthorized receipt of postpetition salary by an officer of a debtor does give rise to a claim for disgorgement.  *See, e.g., In re Toy King Distributors, Inc.*, 256 B.R. 1, 185-86 (Bankr. M.D. Fla. 2000) (finding that creditors' committee established by a preponderance of the evidence that officer received compensation in excess of the approved amount and therefore the officer was liable, pursuant to §549, to the debtor in the amount of the excess payments).  However, as indicated at the Hearing, MarbleLife and the Chapter 7 Trustee made the decision to abandon any claims they may have as a result of the Debtor's alleged violation of L.B.R. 4002-1(b).  As stated by the Chapter 7 Trustee, the Chapter 7 Trustee concluded that Mr. Smith was effectively judgment proof and therefore a pursuit of the estate's claims relating to the recovery of the unauthorized payments to Mr. Smith would be a fruitless endeavor.  Transcript of April 28, 2015 Hearing ("Transcript April 28, 2015"), p.3-5 (discussing the Trustee's conclusions regarding Mr. Smith's financial condition).  In addition, the Chapter 7 Trustee stated to this Court that, as a result of a similar review of Mr. Winterhalter's finances, the Chapter 7 Trustee had concluded that the pursuit of any claims against Mr. Winterhalter premised upon his failure to ensure his client complied with L.B.R. 4002-1(b) would also be a fruitless endeavor.  Transcript April 28, 2015, p.7 (discussing the Chapter 7 Trustee's conclusions regarding Mr. Winterhalter's financial condition).

attention to the Disqualification Motion.  As they had at the Initial Hearing, the parties agreed that this

Court was required to rule upon whether Mr. Winterhalter must be disqualified prior to allowing Mr.

Winterhalter to appear in support of his Compensation Motion.  The US Trustee reiterated his prior

position that the findings contained in the Contempt Memorandum are sufficient to establish that Mr.

Winterhalter possessed an actual conflict as of April 15, 2011, the date Mr. Winterhalter filed the Smith

Response on behalf of Mr. Smith, or, in the alternative, no later than May 16, 2012, the date of the

Contempt Memorandum.  Transcript April 28, 2015, p.9-11.

## II.    DISCUSSION

Subject to court approval, a debtor in possession is entitled to retain counsel provided such

counsel (1) does not hold or represent an interest adverse to the estate and (2) is a disinterested person.

*See* 11 U.S.C. §§101(14) & 327(a); *see also In re Pillowtex, Inc.*, 304 F.3d 246, 250 (3d Cir. 2002) ("The

attorneys selected may not be persons who hold or represent an interest adverse to the estate, and must be

disinterested persons."); *In re First Jersey Securities, Inc.*, 180 F.3d 504, 509 (3d Cir. 1999*); In re Marvel

Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998); *In re Engel*, 124 F.3d 567, 571 (3d Cir.

1997) ("Any debtor-in-possession… must receive court approval in order to employ an attorney or other

professional."); *In re BH & P Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991) (§327(a) creates a two-part

requirement for retention of counsel).  Not only is the requirement that counsel be free from conflicts of

interest a condition of employment, it is also an ongoing duty imposed upon all estate professionals.  *In re

Angelika Films 57th, Inc.*, 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998) ("The duty to avoid conflicts of

interest is ongoing.").  If an actual or potential conflict of interest arises during the course of a

professional's retention, a bankruptcy court is authorized to disqualify the professional.  *In re Marvel

Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998).  As stated by the Third Circuit,

> (1) Section 327(a), as well as §327(c), imposes a per se disqualification as trustee's
> counsel of any attorney who has an actual conflict of interest; (2) the district court may
> within its discretion - pursuant to §327(a) and consistent with §327(c) - disqualify an
> attorney who has a potential conflict of interest and (3) the district court may not
> disqualify an attorney on the appearance of conflict alone.

*Id*. at 476.

In evaluating the circumstances of Mr. Winterhalter's dual representation of the Debtor and Mr.

Smith, this Court must determine whether his dual representation implicates an actual conflict of interest.

To implicate an actual conflict, the dual representation of two clients must involve an active competition

between two interests that necessarily requires the service of one at the expense of the other.  *In re BH &*

*P Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989), *remanded on other grounds*, 119 B.R. 35 (D.N.J. 1990),

*aff'd*, 949 F.2d 1300 (3rd Cir. 1991).  To determine whether a potential conflict is sufficiently egregious

to warrant disqualification, this Court must evaluate the totality of the circumstances.

> This flexible approach will require the bankruptcy courts to analyze the factors present in
> any given case in order to determine whether the efficiency and economy which may
> favor multiple representation must yield to competing concerns affecting fairness to all
> parties involved and protection of the integrity of the bankruptcy process.  Factors to be
> considered include, but are not limited to, the nature of disclosure of the conflict made at
> the time of appointment, whether the interests of the related estates are parallel or
> conflicting, and the nature of the interdebtor claims made.  As we have said,
> denomination of a conflict as "potential" or "actual" and the decision concerning whether
> to disqualify a professional based upon that determination in situations not yet rising to
> the level of an actual conflict are matters committed to the bankruptcy court's sound
> exercise of discretion.  In order to ensure proper review in these cases, those factors
> underlying the exercise of discretion "must be factually substantiated upon the
> evidentiary record."

*In re BH & P Inc.*, 949 F.2d at 1316-17.

As alleged by the US Trustee in the Disqualification Motion, Mr. Winterhalter's dual

representation of the Debtor and Mr. Smith in the contempt proceedings warrants disqualification of Mr.

Winterhalter.  Mr. Winterhalter does not deny that he represented Mr. Smith and the Debtor and it is

undisputable that, due to Mr. Winterhalter's inadvertence, these two parties are presently adverse to each

other.  *See, e.g., In re Toy King Distributors, Inc.*, 256 B.R. 1, 185-86 (Bankr. M.D. Fla. 2000) (finding

that creditors' committee established by a preponderance of the evidence that officer received

compensation in excess of the approved amount and therefore the officer was liable, pursuant to §549, to

the debtor in the amount of the excess payments).  However, the US Trustee does not seek

disqualification based upon any conflicts Mr. Winterhalter may have created for himself as a result of his

inadvertence.  *See, e.g., In re Gress*, Bky. No. 13-06202, 2015 WL 1744165 (Bankr. M.D. Pa. Apr. 14,

2015) (distinguishing between conflicts arising from an attorney's alleged failure to provide competent

bankruptcy representation from conflicts that may warrant disqualification pursuant to §327(a)); *In re Specialty Restaurant Group, LLC*, Bky. No. 07-30779, 2007 WL 1231603 (Bankr. N.D. Tex. Apr. 24, 2007) (same).

In the context of Chapter 11 proceedings, managing the competing demands of representing a debtor in its capacity as a fiduciary of its bankruptcy estate and managing the expectations of principals who, for all practical purposes, function as an attorney's *de facto* client is task fraught with danger. *See, e.g., In re Mican Homes, Inc.*, 179 B.R. 886, 888 (Bankr. E.D. Mo. 1995) ("Simultaneous representation of a Chapter 11 Debtor and the Debtor's principals gives rise to at least a potential conflict of interest."). However, the mere fact that an attorney is formally retained to represent both a debtor and one of its principals is not sufficient to establish the existence of a disqualifying conflict. *Seyfarth, Shaw, Fairweather & Geraldson v. Wintz*, 1999 WL 1129609, *9 (N.D. Ill. Dec. 6, 1999) (The joint representation of a company and its officer does not, by itself, give rise to a conflict of interest."). Provided the interests of the debtor and the other party remain consistent, the dual representation of both is not grounds for disqualification. *In re BH & P Inc.*, 949 F.2d at 1314 ("a professional is not necessarily disqualified from employment based upon his representation of both the trustee and a creditor"); *In re Dawley*, Bky. No. 01-32215, 2003 WL 21460091, *2 (Bankr. E.D. Pa. Jun. 16, 2009) (stating that attorney is not disqualified based upon dual representation unless an actual conflict exists); *In re Angelika Films 57th, Inc.*, 227 B.R. 29 (Bankr. S.D.N.Y. 1998) ("Generally, the interests of a debtor's estate and a debtor's principal must diverge before a counsel's divided loyalty is evidenced").

As admitted by Mr. Winterhalter, the demands unique to representing an individual Chapter 11 debtor or a Chapter 11 debtor that is controlled by a principal are all too familiar to him. He apparently shares the view that his representation of closely-held, corporate debtors is often complicated by the competing demands of the corporate debtor's principals. Transcript May 23, 2012, 65:3-7. However, this Court does not agree with the US Trustee that, standing alone, Mr. Winterhalter's representation of Mr. Smith in connection with the District Court contempt proceedings implicates a disqualifying conflict.

The US Trustee's only evidence of an actual conflict is the Contempt Memorandum, an opinion

that the District Court entered in the 2480 Proceedings in support of its civil contempt order.  Specifically,

the US Trustee argues that the District Court's findings with regard to the purposes of the Lease

Agreement mandate a determination by this Court that the Debtor and Mr. Smith were adverse to each

other.  *See, e.g.,* Transcript April 28, 2015, p.24-25.  To reach this result, the US Trustee invokes the law

of the case doctrine and issue preclusion.

With regard to the law of the case doctrine, this Court finds the doctrine inapplicable to this

Court's consideration of the Disqualification Motion.  While he was involved in the 2480 Litigation, Mr.

Winterhalter was not, technically speaking, a party to it.  As a result, any factual determinations made by

the District Court in connection with its issuance of the Contempt Memorandum would not be binding

upon Mr. Winterhalter.  *In re Grasso*, Civ. No. 14-1741, 2014 WL 3389119, *3 (E.D. Pa. Jul. 11, 2014).

With regard to issue preclusion, this Court reaches the same result.

> A person who was not a party to a suit generally has not had a full and fair opportunity to
> litigate the claims and issues settled in that suit.  The application of claim and issue
> preclusion to nonparties thus runs up against the deep-rooted historic tradition that
> everyone should have his own day in court.

*Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) (internal quotation marks omitted).

Even if Mr. Winterhalter may be considered a party to the 2480 Litigation, this Court finds

application of issue preclusion is insufficient to establish that Mr. Winterhalter's dual representation of

the Debtor and Mr. Smith implicated an actual conflict.  For issue preclusion to result from the Contempt

Memorandum, four conditions must be met.  As elaborated by the Third Circuit, "(1) the identical issue

was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was

necessary to the decision; and (4) the party being precluded from relitigating the issue was fully

represented in the prior action."  *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995).  Here, it

appears that the issue of whether the Debtor and Mr. Smith were rendered adverse was not actually

litigated.

While the District Court determined that the Debtor and Mr. Smith were in contempt of the

Injunction Orders, the District Court made no determination that the two were adverse to each other as a

result of the underlying conduct.[14]  From this Court's review of the Contempt Memorandum, this Court is unable to discern whether the District Court even considered any of the circumstances underlying its decision caused Mr. Smith to acquire an interest adverse to the Debtor.  If the District Court did reach the issue, this Court must presume that the District Court's failure to disqualify Mr. Winterhalter indicates that the District Court did not find that his dual representation implicated an actual conflict of interest.

Because the District Court did not disqualify Mr. Winterhalter, this Court must presume that the Contempt Memorandum does not contain any factual determinations that require the imputation of an actual conflict.  As a result, this Court must infer that the issue was not actually litigated as a result of the Contempt Memorandum.[15]

### III.    CONCLUSION

Based upon the record, this Court cannot determine that, as a result of the factual determinations contained in the Contempt Memorandum, Mr. Winterhalter suffers from an actual conflict of interest.[16]

---

[14] To the extent the District Court has addressed the issue, it had previously reached the opposite result.  As recognized by the District Court in the First Contempt Order, Mr. Smith - as the sole shareholder, director and officer of the Debtor - was the real party in interest in the 2480 Litigation.  Based upon this dynamic, the District Court concluded that "a civil contempt order against Smith would be the functional equivalent as issuing the order against Defendant, as Stone Resources would be forced to indemnify Smith."  First Contempt Order, n.1.  In other words, the District Court determined that the interests of the Debtor and Mr. Smith were, at least at the time of the issuance of the First Contempt Order, aligned with regard to the litigation of the 2480 Litigation and any potential liability that may accrue to the Debtor as a result.

[15] In addition, this Court does not agree with the US Trustee's position that Mr. Winterhalter was required to file a supplemental 2014(a) statement within 14 days of his filing the Smith Response on April 15, 2011.  As evidenced by the District Court's First Contempt Order that was published ton April 1, 2011, it was already self-evident that Mr. Winterhalter's representation of the Debtor involved the simultaneous representation of Mr. Smith.  While this Court agrees that prudence should have warranted the filing of a supplemental 2014(a) statement disclosing Mr. Winterhalter's decision to represent Mr. Smith.  However, this Court must admit that the disclosure of Mr. Winterhalter's relationship with Mr. Smith, the Debtor's sole shareholder, would have added nothing to the public record.  *See, e.g.*, First Contempt Order (recognizing that "Smith, although not a party to this action, is the real party defendant.").

[16] In reaching the determination that the findings contained in the Contempt Order do not establish that Mr. Winterhalter's dual representation of the Debtor and Mr. Smith implicates a disqualifying conflict, this Court does not accept Mr. Winterhalter's proffered standard for evaluating whether a conflict is sufficiently egregious as to warrant disqualification.  Apparently, Mr. Winterhalter believes that the dual representation of a debtor-in-possession and its principal is permissible provided neither holds a direct claim against the other.  As Mr. Winterhalter framed the issue for this Court,

> Now, Judge, the issue comes, is there a claim against Mr. Smith?  Does the debtor have a claim against Mr. Smith?  Does Mr. Smith have a claim against the debtor?  Does any portion of Judge Tucker's determination say that there is a present, existing claim by the debtor against Mr. Smith or Mr. Smith against the debtor?

Transcript May 23, 2012, 44:14-44:19.

This Court finds this standard to be far too liberal.  Whether or not a debtor possesses a matured claim against its principal cannot be the measure of whether the dual representation of both implicates an actual conflict of interest.  Whether or not a conflict has matured into an actionable claim against the one or another party cannot be the test for determining whether an attorney's dual representation implicates a conflict warranting disqualification.  Due to debtor's counsel ability to control the administration of a

Mr. Winterhalter was not a party to the 2480 Litigation and, more importantly, the issue of whether Mr.

Smith and the Debtor were adverse was not actually litigated.  Because the US Trustee supplied no other

basis for this Court to infer that Mr. Winterhalter's dual representation of the Debtor and Mr. Smith

implicated an actual conflict of interest, this Court must deny the Motion.

     An Order consistent with this Memorandum Opinion will be entered.


     By the Court:


_____
MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

Dated:  May 4, 2017

---

debtor's estate, debtor's counsel is uniquely positioned to ensure, through her management of a debtor's bankruptcy case, that an actual claim is not engendered.  When a counsel is influenced by incentives to choose one litigation strategy over another in order to benefit one client over another, a disabling conflict exists.  Counsel may, through the creative management of a debtor's bankruptcy, avoid a conflict from blossoming into a mature claim.  The fact that counsel may choose certain litigation strategies over others is precisely the kind of incentives these rules seek to avoid.

> The real vice in these situations involving attorneys for a debtor-in-possession taking actions which benefit the individual debtor but arguably damage the bankruptcy estate, without full disclosure of all the factors involved and preferably incorporating the same within a plan of reorganization, is that "we will never know" what might have resulted had the bankruptcy estates' interests been preferred over the interests of the individual debtor.

*In re Rancourt*, 207 B.R. 338, 360 (Bankr. D.N.H. 1997).